Elena STURDZA, Appellant,

v.

UNITED ARAB EMIRATES, et al., Appellees.

No. 02–SP–353.

District of Columbia Court of Appeals.

Argued Feb. 16, 2010.

Decided Jan. 6, 2011.

---

Nathan Lewin, with whom Alyza D. Lewin, Washington, DC, was on the brief, for appellant.

Hamilton Loeb, with whom Adam van Alstyne, Washington, DC, was on the brief, for appellee United Arab Emirates.

John King, Washington, DC, with whom Brett A. Pisciotta, Rockville, MD, was on the brief, for appellee Vasilios Demetriou, Personal Representative of the Estate of Angelos C. Demetriou.

Before RUIZ and GLICKMAN, Associate Judges, and BELSON, Senior Judge.

GLICKMAN, Associate Judge:

In *Sturdza v. United Arab Emirates,* 350 U.S.App. D.C. 154, 170, 281 F.3d 1287, 1303 (2002), the United States Court of Appeals for the District of Columbia Circuit certified the following question of law to this court pursuant to D.C.Code § 11–723(a) (2001):

> Under District of Columbia law, is an architect barred from recovering on a contract to perform architectural services in the District or in quantum meruit for architectural services rendered in the District because the architect began negotiating for the contract, entered into the contract, and/or performed such services while licensed to practice architecture in another jurisdiction, but not in the District?

We respond affirmatively: subject to immaterial exceptions, District of Columbia law bars an architect from recovering on a contract to perform architectural services in the District or in quantum meruit for architectural services rendered in the District, if the architect lacked a District of Columbia architect's license when he or

she negotiated or entered into the contract or when he or she performed the architectural services, even if the architect was licensed to practice architecture in another jurisdiction at such times.[1]

## I. Factual and Procedural Background[2]

In 1993, the United Arab Emirates ("UAE") held a competition for the architectural design of a new embassy and chancery building in Washington, D.C. Elena Sturdza, an architect licensed under the laws of Maryland and Texas, but not by the District of Columbia, entered the competition and submitted a design. A jury composed of architects and civil engineers judged the competition entries. At the conclusion of the competition, the UAE informed Sturdza that she had won.

Sturdza and the UAE then entered into contract negotiations. Over the next two years they exchanged multiple contract proposals. During that period, at the UAE's request, Sturdza modified her design and worked with an engineer to address various technical issues. She agreed to defer billing the UAE for her work until the execution of their contract. At last, in early 1996, the UAE sent Sturdza a final draft agreement "incorporating all the changes mandated by the Ambassador."[3] Sturdza informed the UAE that she assented to the changes. Without explanation, however, the UAE then stopped communicating with Sturdza. It never signed a contract with her.

There things stood until late 1997, when Sturdza learned that the UAE had furnished a proposed design for its new embassy to the National Capital Planning Commission. Sturdza obtained a copy of the proposal. She discovered that the UAE had submitted a design prepared by a District of Columbia architect named Angelos Demetriou. This design differed from the one Demetriou had entered in the 1993 competition and, Sturdza believed, it "copied and appropriated many of the design features that had been the hallmark of her design."[4] The UAE eventually contracted with Demetriou to use his revised design in the construction of its embassy.

In 1998, Sturdza filed suit against the UAE and Demetriou in the United States District Court for the District of Columbia. Her amended complaint stated several causes of action against one or both defendants. The question that has been certified to us concerns Sturdza's breach of contract and quantum meruit claims against the UAE. Count One of the amended complaint alleged that the UAE had breached its contract with Sturdza by, *inter alia*, failing to memorialize their contract, "concerning which substantial performance had already commenced"; awarding the embassy design contract in-

---

1. Although the D.C. Circuit certified the question in 2002, federal court proceedings pertaining to the appointment of a guardian *ad litem* for Sturdza delayed presentation of the matter to us until 2009. We also note that the certified question is limited to Sturdza's breach of contract and quantum meruit causes of action. We have no occasion in this opinion to address the viability of any of the other causes of action she pleaded in her complaint, which included conspiracy to commit sex discrimination, conspiracy to commit fraud, and other torts in addition to

copyright infringement. *See Sturdza*, 350 U.S.App. D.C. at 158, 281 F.3d at 1291.

2. We address the certified question in light of the pertinent facts set forth in the D.C. Circuit's opinion. *See Sturdza*, 350 U.S.App. D.C. at 158–59, 168, 281 F.3d at 1291–92, 1301.

3. *Sturdza*, 350 U.S.App. D.C. at 159, 281 F.3d at 1292.

4. *Id.* (quoting Sturdza's first amended complaint).

stead to Demetriou; and failing to pay Sturdza her fee, including her charges for the work she performed after the UAE declared her the winner of the competition.[5] Count Two of the amended complaint sought quantum meruit recovery for Sturdza's preparation of the embassy design and other architectural services. The district court granted summary judgment for the UAE on each of these claims. It concluded that Sturdza is barred from recovering contractual or quasi-contractual damages under District of Columbia law because she was not licensed to practice architecture in the District either when she negotiated and contracted with the UAE or when she performed the services for which she sought compensation.[6]

On appeal, the D.C. Circuit was "inclined to agree" that the District's licensing law precludes Sturdza's contractual and quasi-contractual causes of action. The court noted that Sturdza "went beyond submitting bids and actually performed architectural services—in her own words, 'substantially performed' the contract"—without the required license.[7] For that reason, the court rejected Sturdza's contention that she merely sought to enforce a contract for future services and would have obtained a D.C. license before she actually rendered those services. Nonetheless, the court expressed uncertainty as to "the implications (if any)" of a statutory exception allowing architects licensed in other jurisdictions to agree to provide architectural services in the Dis-

trict if they became licensed under D.C. law before rendering any performance.[8] In addition, the court observed, an unlicensed architect's right to recover in the circumstances of this case raises a question of "extreme public importance" given the special status of the District of Columbia[9]:

> We assume that architects throughout the country (perhaps even around the world) unlicensed to practice in the District often submit bids to perform architectural services in this city of embassies, monuments, and public buildings. Precisely how D.C. law applies to this unique characteristic of Washington, D.C. and its economy is a question best resolved by the D.C. Courts. [10]

Deeming local law to be "genuinely uncertain" on the issue of whether Sturdza's contract and quantum meruit claims were foreclosed in these circumstances, the D.C. Circuit concluded that "the wisest course of action" was to certify the question to the District of Columbia Court of Appeals.[11]

## II. The Scope of the Architectural Licensing Requirement

Beginning in 1950 with an amendment of the Architect's Registration Act, and continuing to the present day, the law of the District of Columbia has imposed a licensure requirement on the practice of architecture in this jurisdiction in order "to safeguard life, health, and property, and to

---

5. *Id.*, 350 U.S.App. D.C. at 168, 281 F.3d at 1301 (quoting Sturdza's first amended complaint).

6. *Id.* See *Sturdza v. United Arab Emirates*, No. 98–2051, 1999 U.S. Dist. LEXIS 23173, at *14–20 (D.D.C. Dec. 22, 1999).

7. *Sturdza*, 350 U.S.App. D.C. at 169, 281 F.3d at 1302 (quoting Sturdza's first amended complaint; internal brackets omitted).

8. *Id.*, 350 U.S.App. D.C. at 169–170, 281 F.3d at 1302–03.

9. *Id.*, 350 U.S.App. D.C. at 170, 281 F.3d at 1303 (internal quotation marks omitted).

10. *Id.*

11. *Id.* (internal quotation marks omitted).

promote the public welfare."[12] In its current form, the D.C.Code provides in pertinent part that "[u]nless licensed to practice architecture under this subchapter,[13] no person shall engage, directly or indirectly, in the practice of architecture in the District...."[14] The same prohibition was in effect at the time of the events giving rise to this case.[15] For licensing purposes, the "practice of architecture" is defined to mean "rendering or offering to render services in connection with the design and construction, enlargement, or alteration of a structure or group of structures that have as their principal purpose human occupancy or habitation ... includ[ing] planning and providing studies, designs, drawings, specifications, and other technical submissions, and the administration of construction contracts."[16] The "practice of architecture" thus encompasses not only the performance of architectural services, but also any negotiations and agreement to provide such services.

█ Enlarging upon the concern of the D.C. Circuit, Sturdza argues that the District's architectural licensing statute should not be construed to apply to architects who submit plans in the District in international architectural design competitions. According to Sturdza, "it is plain" that the consumer protection concerns underlying the licensure requirement do not apply to such competitions, because the purpose of the law is merely to protect "ordinary local DC consumers against fraudulent practices and representations by persons holding themselves out as experts."[17] Moreover, Sturdza asserts, insistence on licensure would "disable and diminish" international architectural competition in the District, because "[l]eading international architects cannot be expected to apply for and await receipt of local licenses in every jurisdiction to which they bend their talents."[18]

We are not persuaded by Sturdza's argument. It is not "plain" to us that the public welfare rationale for licensing architects is inapplicable to international competitions to design buildings such as the UAE embassy. For the safety and well-being of those who work in and visit such buildings, and of neighboring property owners, we would suppose the District has every reason to insist that the architects who design them and oversee their construction be qualified, and hence licensed, to do so. Nor does the record support the bald assertion that enforcement of the licensing requirement would stifle competition in design contests for District edifices.

12. *Dunn v. Finlayson*, 104 A.2d 830, 832 (D.C.1954) (internal quotation marks omitted).

13. The reference is to Subchapter I–B of the District's General License Law, D.C.Code § 47–2853.01 *et seq.* (2001), which sets forth licensing requirements for the practice of architecture and numerous other "Non–Health Related Occupations and Professions." Licensure of architects is mandated in order "to protect the public": to secure a license, practitioners "must meet specified educational and training requirements, must demonstrate competency ... through examination or other proof of fitness, or must have a specified amount of experience...." *Id.* § 47–2853.02(d)(1).

14. D.C.Code § 47–2853.63 (2001). A few exceptions to this prohibition, none of them applicable to the present case, are set forth in D.C.Code § 47–2853.03 (2001).

15. *See* D.C.Code § 2–261(b) (1994 Repl.) ("[N]o unlicensed person shall engage, directly or indirectly, in the practice of architecture in the District....").

16. D.C.Code § 47–2853.61 (2001) (formerly codified at D.C.Code § 2–241 (1994 Repl.)).

17. Brief for Appellant at 9.

18. *Id.* at 7.

Sturdza acknowledges that renowned international architects have won such competitions in the past, and she gives us no reason to believe it an onerous impediment for architects licensed elsewhere to have to secure a District license (or, perhaps, make other appropriate arrangements) in order to compete in this jurisdiction.

But even if we were prepared to agree with Sturdza on these matters, her argument founders on the plain language of the statute. The licensing requirement for the practice of architecture in the District is categorical. It contains no exemption for international design competitions; indeed, it admits of no exception based on the type of client or architectural service rendered. We must apply the statute as it is written and not create *ad hoc* exceptions by judicial decree based on nebulous policy considerations.[19] Sturdza's arguments are addressed more properly to the legislature.

Somewhat diffidently, Sturdza proposes a second possible limitation on the scope of the licensing requirement. It "may" be argued, she suggests, that application of the District's architectural licensing law to the performance of architectural services for the UAE's embassy is pre-empted by the Foreign Missions Act of 1982[20] (dealing with federal jurisdiction over foreign missions) or the International Center Act[21] (authorizing the federal government to sell or lease property in Northwest Washington, D.C. to foreign governments). In a variation on that theme, Sturdza claims these federal laws somehow dispel any need for the local licensing requirement. However, we see nothing in either law that would limit, or render unnecessary, the application of the District's licensure requirement for architects. We note, moreover, that the Foreign Missions Act requires foreign missions to comply with the District's "building and related codes"[22] and specifically states that it does not "preempt any State or municipal law or governmental authority regarding zoning, land use, health, safety, or welfare...."[23] The International Center Act similarly requires foreign government transferees and grantees to comply with "all ... applicable District of Columbia codes and regulations relating to building construction" (with the sole exception of zoning regulations).[24] If anything, these provisions lend added support to the conclusion that federal law does not exempt services for foreign embassies from the

---

19. *Cf. RDP Dev. Corp. v. Schwartz,* 657 A.2d 301 (D.C.1995). In that case we construed a provision of the District of Columbia Real Estate Licensure Act prohibiting unlicensed brokers from maintaining actions to recover for their services. We rejected an argument, similar to the one made here, that the Act "was not intended to apply to commercial real estate transactions involving knowledgeable and sophisticated parties who are capable of protecting themselves," and that such application of the law was "at odds with modern business reality." *Id.* at 307. The Act, we declared, was

> designed to chill unlicensed practice by denying transgressors any recovery regardless of the services they provide or the status of their client. Given the broad remedial objectives of the Act, we construe it generous-

ly and will not create an exception to the legislative mandate which would exempt from the Act's coverage the most lucrative area of brokerage practice.
*Id.*

20. Pub.L. No. 97–241, 96 Stat. 273 (codified as 22 U.S.C. §§ 4301 *et seq.* (2006)).

21. Pub.L. 90–553, 82 Stat. 958 (1968), *as amended by* Pub.L. 97–186, 96 Stat. 101 (1982).

22. 22 U.S.C. § 4306(g).

23. *Id.* § 4307.

24. *See* § 4, 82 Stat. 959, *as amended by* § 3, 96 Stat. 101.

District's prohibition of the practice of architecture without a license.

## III. The Bar to Recovery for Unlicensed Practice

 The rule is well-established in the District of Columbia "that a contract made in violation of a licensing statute that is designed to protect the public will usually be considered void and unenforceable, and [that] the party violating the statute cannot collect monies due on a quasi-contractual basis" either.[25] Although the operation of this rule may appear to be "harsh and disproportionate" in some cases, we have "uniformly" rejected appeals to deviate from or mitigate it; the "potential unfair applications of the rule at the margins have not persuaded us to sacrifice the benefits of a clear-cut, unmistakable requirement, with equally clear consequences for noncompliance, in this area of consumer protection."[26] Architects who practice without a license are not exempted from the general rule. We have held that one who engages in the "practice of architecture" in this jurisdiction without having secured the necessary District of Columbia license is barred from recovering for his or her services in an action for breach of contract or quantum meruit.[27]

As the D.C. Circuit noted, a limited statutory exception to that bar was in effect during the period in which Sturdza negotiated with the UAE (though the exception has no analog in the current Code). The exception, set forth in former D.C.Code § 2–262(6), stated that an architect licensed elsewhere in the United States could "agree[ ] to perform or represent that he or she is able to perform any of the services involved in the practice of architecture, provided that the architect shall not perform any of the services involved in the practice of architecture until licensed under this subchapter."[28] Failure to comply with the proviso rendered the exception inapplicable. An architect who performed "any" of the agreed-upon services

---

**25.** *Truitt v. Miller*, 407 A.2d 1073, 1079 (D.C. 1979); *see also Saul v. Rowan Heating & Air Conditioning, Inc.*, 623 A.2d 619, 621 (D.C. 1993) ("This jurisdiction has held consistently that a contract entered in violation of a licensing statute or regulation directed at protecting the public is void and unenforceable.").

**26.** *Cevern, Inc. v. Ferbish*, 666 A.2d 17, 20 (D.C.1995) (citing cases). "[T]he court has been insistent that quantum meruit recovery for performance in return for a promise unenforceable on public policy grounds is forbidden." *Id.* at 22 (footnote omitted). *But cf. Remsen Partners, Ltd. v. Stephen A. Goldberg Co.*, 755 A.2d 412 (D.C.2000). The question in that case was whether a party that had fully performed real estate brokerage services under contract would have to return the fees it had received because it lacked the required brokerage license and therefore would have been unable to enforce the contract. We held not, explaining that unless an applicable statute or regulation specifically requires it, the equitable remedy of disgorgement of monies paid under an illegal contract does not follow automatically in all cases, but depends on a consideration of all the equities in the light of relevant public policy. The application of that principle in the case of an unlicensed architect is outside the scope of the certified question; it does not arise because Sturdza never received any payment from UAE.

**27.** *See Holiday Homes, Inc. v. Briley*, 122 A.2d 229, 230 (D.C.1956) (stating that the licensing requirement in the Architect's Registration Act is "designed for the public welfare and one who engages in the practice of architecture in violation thereof cannot recover for his services"). In *Holiday Homes*, we held that even a licensed architect was precluded from recovering for services performed during a period in which his license had lapsed. *Id.* at 231–32. *See also Dunn v. Finlayson*, 104 A.2d 830, 832 (D.C.1954).

**28.** D.C.Code § 2–262(6) (1994 Repl.), *repealed by* Second Omnibus Regulatory Reform Amendment Act of 1998, D.C. Law 12–261, § 1235, 46 D.C.Reg. 3142, 3212 (Apr. 20, 1999).

before obtaining the required D.C. license therefore could not invoke the statutory exception even for services he or she rendered after becoming licensed.[29] Because Sturdza substantially performed her contract with the UAE without first having obtained a D.C. license, she could not benefit from former § 2–262(6). She failed to avail herself of the exception.

## IV. Conclusion

Based on the preceding discussion, we answer the question certified to us by the D.C. Circuit as follows. District of Columbia law does bar an architect from recovering (i) on a contract to perform architectural services in the District or (ii) in quantum meruit for architectural services rendered in the District, if the architect lacked a District of Columbia architect's license when he or she began negotiating the contract, entered into the contract, or performed the architectural services, even if the architect was licensed to practice architecture in another jurisdiction at such times. Pursuant to a former statutory exception (in effect at the time of the events giving rise to this lawsuit but since repealed), an architect licensed in another jurisdiction but not in the District was permitted to negotiate and enter into a contract to perform architectural services in the District without being subject to the foregoing bar, so long as the architect obtained a license in the District before actually performing any of the services. There is no exception for international design competitions or the submission of bids to perform architectural services for foreign embassies (or public buildings or monuments) in the District.

29. *Cf. Cevern,* 666 A.2d at 22 (holding that where a home improvement contractor entered into a contract and impermissibly accepted progress payments before it obtained

In accordance with D.C.Code § 11–723(g), the Clerk shall transmit a copy of this opinion to the United States Court of Appeals for the District of Columbia Circuit and to each of the parties.

*So ordered.*

the necessary license, it was barred from recovering for the work it performed under the contract even *after* it acquired the license).