Elena STURDZA, Appellant,

v.

**UNITED ARAB EMIRATES,**
et al., Appellees.

No. 00–7279.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 9, 2001.

Decided March 8, 2002.

Nathan Lewin argued the cause for appellant. With him on the briefs were Alyza D. Lewin and David T. Shapiro.

John A. King argued the cause and filed the brief for appellees Angelos Demetriou & Associates and Angelos C. Demetriou.

Haig V. Kalbian and Mary M. Baker were on the brief for appellee The Government of the United Arab Emirates.

Before: HENDERSON and TATEL, Circuit Judges, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge TATEL.

Concurring opinion filed by Circuit Judge HENDERSON.

TATEL, Circuit Judge:

This case involves a dispute between two architects, one of whom, Elena Sturdza, accuses the other, Angelos Demetriou, of stealing her design for the United Arab Emirates' new embassy. In addition to suing Demetriou and the UAE for copyright infringement, Sturdza charges the UAE with breach of contract, as well as with conspiracy to commit sex discrimination in violation of 42 U.S.C. § 1985, and Demetriou with several torts: conspiracy to commit fraud, tortious interference with contract, and intentional infliction of emotional distress. Concluding that no reasonable jury could find Demetriou's design "substantially similar" to Sturdza's, the district court granted summary judgment for Demetriou and the UAE on the copyright infringement claim. The district court also dismissed Sturdza's breach of contract claim, concluding that District of Columbia law bars such claims by architects who (like Sturdza) have no D.C. architecture license; her tort claims, finding them preempted by the federal Copyright Act; and her section 1985 claim, concluding that foreign governments are not "persons" within the meaning of the statute. We agree with the district court's section 1985 ruling, but have a different view of Sturdza's other claims. Although differences between the two embassy designs could permit a reasonable jury to conclude that Demetriou's design is not "substantially similar" to Sturdza's, because we believe there are sufficient similarities for the jury to reach the opposite conclusion, we reverse the grant of summary judgment. While the district court may well be correct that D.C. law bars Sturdza's breach of contract claim, we think the law sufficiently uncertain to warrant certifying the issue to the D.C. Court of Appeals. Finally, because Sturdza's tort claims are qualitatively different from her copyright infringement claim and therefore not preempted, we reverse the dismissal of those claims.

I.

In 1993, the United Arab Emirates held a competition for the architectural design of a new embassy and chancery building that it planned to build in Washington, D.C. The UAE provided competitors

with a "Program Manual" detailing requirements for various aspects of the design. According to the cover letter accompanying the Manual, the UAE sought a "modern sophisticated multi-use facility expressing the richness and variety of traditional Arab motifs." Letter from Mohammed Al–Shaali, Ambassador, United Arab Emirates, to Angelos Demetriou, President, Demetriou & Associates 1–2 (June 7, 1993).

Appellant Elena Sturdza submitted a design, as did appellee Angelos Demetriou and his architecture firm, Demetriou & Associates. A "jury" comprised of architects and civil engineers judged the competition entries. First Am. Compl. ¶ 15; Adham Hamdan Decl. ¶ 14. The UAE informed Sturdza that she had won.

Sturdza and the UAE then began contract negotiations, exchanging eight contract proposals over the course of the next two years. In late 1994, the UAE requested some "minor changes" to the design and asked Sturdza to provide multiple, bound copies for UAE officials. First Am. Compl. ¶ 23. Sturdza complied with both requests. A year later, the UAE asked Sturdza to perform certain "geotechnical" engineering services needed to commence construction. *Id.* ¶ 25. Complying with this request as well, Sturdza hired an engineer and assisted him in addressing various technical issues. The UAE asked Sturdza to defer billing for these services because it was "about to sign the contract." *Id.* ¶ 28. According to the UAE's Director of Public Relations, the UAE and Sturdza had reached agreement on all issues by late 1995. In early 1996, the UAE made several changes in the draft contract, sending Sturdza a "final draft incorporating all the changes mandated by the Ambassador." Facsimile transmission from John T. Szymkowicz, Attorney, Szymkowicz & Buffington, to Elena Sturdza (June 7, 1996). Although Sturdza in-

formed the UAE that she agreed to these changes, the UAE ceased communicating with her, neither signing the contract nor responding to her repeated attempts to make contact.

In late 1997, Sturdza learned that the UAE had presented an embassy design to the National Capital Planning Commission. Visiting the Commission and obtaining a copy of the design, Sturdza discovered not only that it was Demetriou's, but also that it differed from his 1993 competition entry and, according to Sturdza, "copied and appropriated many of the design features that had been the hallmark of her design." First Am. Compl. ¶ 47. The UAE eventually contracted with Demetriou to use his revised design and began building its embassy.

■ Sturdza filed suit in the United States District Court for the District of Columbia against the UAE and Demetriou. Her amended complaint raises four categories of claims relevant to this appeal: (1) a copyright claim against the UAE and Demetriou (Count Three); (2) breach of contract and quantum meruit claims against the UAE (Counts One and Two); (3) tort claims for conspiracy to commit fraud, tortious interference with contract, and intentional infliction of emotional distress against Demetriou (Counts Five, Six, and Seven); and (4) a claim for conspiracy to commit sex discrimination in violation of 42 U.S.C. § 1985 against the UAE (Count Eight). The district court granted summary judgment against Sturdza on her copyright infringement, breach of contract, and quantum meruit claims, and dismissed under Federal Rule of Civil Procedure 12(b)(6) her conspiracy to commit fraud, tortious interference with contract, intentional infliction of emotional distress, and section 1985 claims. *See Sturdza v. United Arab Emirates,* No. 98–2051, slip op. at 7–9 (D.D.C. July 22, 1999) (tort claims);

*Sturdza v. United Arab Emirates,* No. 98–2051, slip op. at 11, 14 (Dec. 22, 1999) (breach of contract, quantum meruit, and section 1985 claims); *Sturdza v. United Arab Emirates,* No. 98–2051, slip op. at 15 (Oct. 30, 2000) (copyright claim). Sturdza appeals. Our review is de novo. *Wilson v. Pena,* 79 F.3d 154, 160 n. 1 (D.C.Cir. 1996) ("Our standard of review under Federal Rules 12(b)(6) and 56 is the same: *de novo.*").

## II.

We begin with a threshold issue. Claiming that certain filings by Sturdza and her appellate counsel have inflicted "irreparable prejudice," "tainted the record before this Court," and improperly portrayed them as "villains," the UAE and Demetriou moved to dismiss this appeal pursuant to D.C. Circuit Rule 38. Appellees' Mot. to Dismiss Appeal at 8–10. Under Rule 38, we may impose sanctions, including dismissal,

> [w]hen any party to a proceeding before this court or any attorney practicing before this court fails to comply with the FRAP or these rules, or takes an appeal or files a petition or motion that is frivolous or interposed for an improper purpose, such as to harass or to cause unnecessary delay[.]

D.C. CIR. R. 38. We deferred ruling on the motion to dismiss until after oral argument. We now deny the motion.

The filings about which the UAE and Demetriou complain began after Sturdza's appellate counsel, Nathan Lewin, submitted his opening brief. In several pro se motions and other documents, Sturdza accused Lewin of failing to follow her directions and sought to bring to our attention her own view of Demetriou's and the UAE's conduct. In one motion, Sturdza attempted to add "critical information" to her appellate brief that she said was "either missing or false." Appellant's Pro Se Mot. to File Corrections at 1. Denying that motion, we reminded Sturdza that "[a]ppellant has counsel whom she has retained and thus is her representative in this appeal.... So long as appellant is represented by counsel, the attorney speaks on her behalf before this court." Order of the United States Court of Appeals for the District of Columbia Circuit at 1 (Aug. 29, 2001) (No. 00–7279).

Undeterred, Sturdza made additional pro se filings accusing Lewin of failing to represent her properly. For example, in a "motion for reconsideration," she charged that Lewin "intentionally delayed submissions for [her] review ... to deprive her of adequate time to act," reiterating that her appellate brief contains "false statements, misleading statements and omissions [of] important facts." Appellant's Pro Se Mot. for Recons. at 2.

Lewin filed several affidavits in which he denied Sturdza's accusations and described his efforts to consult with Sturdza regarding her appeal. Lewin also submitted copies of correspondence illustrating his efforts to communicate with Sturdza. In one such letter, Lewin explained that "based on [his] professional judgment and experience," he decided to omit certain material from the appellate brief, namely, "poor legal arguments, unsubstantiated factual allegations and other material that was not suitable for the brief and would have reduced its persuasiveness[.]" Letter from Nathan Lewin, Attorney, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, to Elena Sturdza 2–3 (Sept. 7, 2001). Lewin attached to his reply brief a copy of Sturdza's handwritten account of the merits of her case—a document containing numerous strongly worded allegations against Demetriou and the UAE, her district court counsel (not Lewin), and the district court judge. *See* Appellant's Reply Br. Addendum at 8–9 (stating among other things

that the appellees engaged in a "planned theft" of Sturdza's design and that the UAE had "exercise[d] its power over [Sturdza's trial] counsel and the U.S. judge"). Explaining why he included this material, Lewin stated, "I do not wish to be a barrier to Ms. Sturdza's effort to be heard individually—even on matters that I personally believe are baseless or do not warrant presentation to the Court." Lewin Aff. (Oct. 1, 2001) ¶ 10. Finally, Lewin expressed his opinion that the pressures created by this litigation had affected Sturdza psychologically and led to her pro se filings, to which Sturdza responded: "[M]y emotional instability, if any, is caused by the distress inflicted by all the defendants … and by the mystery in which my counsel has deepened me." Sturdza Aff. (Sept. 21, 2001) ¶ 7.

In our view, these filings fall far short of Rule 38 sanctionable behavior. To begin with, the UAE's and Demetriou's suggestion that our view of this case could be influenced by either Sturdza's pro se filings or Lewin's explanations is preposterous. This court is not a jury requiring protection from wayward comments. Moreover, none of the circumstances that have led us to impose Rule 38 sanctions exist here. While we advised Sturdza that only counsel spoke for her so long as she was represented, neither she nor Lewin violated an express court order. *Cf., e.g., CNPQ Conseiho Nacional de Desenvolvimento Cientifico e Technologico v. Fontes,* No. 95–7067, 1996 WL 680208, at *1 (D.C.Cir. Oct. 4, 1996), *clarified on reh'g, id.* (Dec. 12, 1996) (dismissing appeal under Rule 38 in part because appellant refused to comply with court directive to file response to order to show cause). Nor have the UAE and Demetriou offered any grounds to conclude that Sturdza's pro se filings or Lewin's responses were "frivolous or interposed for an improper purpose." D.C. CIR. R. 38; *cf., e.g., Whitehead v. Metro Goldwyn Mayer Studio,*

*Inc.,* No. 00–7164, 2001 WL 135848, at *1 (D.C.Cir. Jan. 19, 2001) (assessing attorneys' fees and costs where appeal was "frivolous and appellees provide[d] evidence that appellant's claims [we]re presented in bad faith"). To the contrary, these filings merely represent a worried client's misguided but not improperly motivated attempt to express her concerns about her case, and her lawyer's responses. Finally, the UAE and Demetriou allege no want of prosecution. *Cf., e.g., Ray v. Reno,* No. 96–5005, 1996 WL 761944, at *1 (D.C.Cir. Dec. 26, 1996) (dismissing appeal for failure to prosecute).

■ Not only does nothing in the challenged filings warrant dismissal, but we believe Lewin proceeded with the utmost propriety, delicately balancing his ethical obligations to his client and his responsibilities as an officer of this court. Lewin made clear to Sturdza that although she could discharge him, so long as he remained counsel he "retained the final and ultimate responsibility to determine the contents" of the briefing. Lewin Aff. (Oct. 1, 2001) ¶ 2. In doing so, Lewin carefully explained to Sturdza why he thought the additional arguments she wished to make were without merit and why the material she wanted added to the Joint Appendix should not be included. At the same time, to fully protect his client's interests, Lewin made sure we were fully aware of her position. This is precisely how appellate counsel should behave; indeed, we expect all lawyers practicing in this court to resist a client's desire to make "poor legal arguments" or "unsubstantiated factual allegations." Letter from Nathan Lewin, *supra* p. 1293, at 2–3; *see also* D.C. R. PROF'L CONDUCT 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous…."); D.C. CIR. R. app. II R. I

(adopting D.C.Code of Professional Conduct). We thus turn to the merits of this appeal.

### III.

To prevail on a copyright claim, a plaintiff must prove both ownership of a valid copyright and that the defendant copied original or "protectible" aspects of the copyrighted work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 348, 361, 111 S.Ct. 1282, 1289, 1296, 113 L.Ed.2d 358 (1991). "Not all copying, however, is copyright infringement." *Id.* at 361, 111 S.Ct. at 1296. The plaintiff must show not only that the defendant actually copied the plaintiff's work, but also that the defendant's work is "substantially similar" to protectible elements of the plaintiff's work. *See, e.g., Boisson v. Banian, Ltd.,* 273 F.3d 262, 267–68 (2d Cir.2001); *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 606 (1st Cir.1988); *see generally* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.01[B], at 13–8 to 13–10 (2001) (explaining that while few courts clearly differentiate between actual copying and substantial similarity, both are clearly required, and the latter inquiry concerns whether actual copying is legally actionable). In their motions for summary judgment, the UAE and Demetriou disputed neither Sturdza's ownership of a valid copyright nor that Demetriou actually copied Sturdza's design. Instead they argued, as they do here, that Sturdza cannot prove substantial similarity.

The substantial similarity inquiry consists of two steps. The first requires identifying which aspects of the artist's work, if any, are protectible by copyright. "[N]o author may copyright facts or ideas. The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality." *Feist Publ'ns,* 499 U.S. at 350, 111 S.Ct. at

1289 (internal quotation marks and citation omitted) (alteration in original); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery...."). Using Shakespeare as an example, Judge Learned Hand explained the distinction between protectible expression and unprotectible ideas:

> If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's "ideas" in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species.

*Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930); *see also, e.g., Country Kids 'N City Slicks, Inc. v. Sheen,* 77 F.3d 1280, 1286 (10th Cir.1996) (holding that "wooden form of the traditional paper doll" is idea not expression). "[N]o principle," Judge Hand said, "can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be ad hoc." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960).

Also relevant to this case, copyright protection does not extend to what are known as *scènes à faire,* i.e., "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *Atari, Inc. v. North Am. Philips Consumer Elecs. Corp.,* 672 F.2d 607, 616

(7th Cir.1982) (internal quotation marks and citation omitted), or elements that are "dictated by external factors such as particular business practices," *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 401 (5th Cir.2000). For example, because "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction[,] . . . they are not copyrightable." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir.1986); *see also Computer Mgmt.*, 220 F.3d at 401 (holding that computer program features dictated by "computer manufacturer design standards" were *scènes à faire*).

Once unprotectible elements such as ideas and *scènes à faire* are excluded, the next step of the inquiry involves determining whether the allegedly infringing work is "substantially similar" to protectible elements of the artist's work. "Substantial similarity" exists where "the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Country Kids*, 77 F.3d at 1288 (internal quotation marks and citation omitted). Substantial similarity turns on the perception of the "ordinary reasonable person" or "ordinary observer," *id.* As the Second Circuit explained:

> [t]he plaintiff's legally protected interest is . . . his interest in the potential financial returns from his [work] which derive from the lay public's approbation of his efforts. The question, therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the . . . lay . . . audience . . . that defendant wrongfully appropriated something which belongs to the plaintiff.

*Arnstein v. Porter*, 154 F.2d 464, 473 (2d Cir.1946).

The substantial similarity determination requires comparison not only of the two works' individual elements in isolation, but also of their "overall look and feel." *Boisson*, 273 F.3d at 272 (internal quotation marks and citation omitted). "[A]n allegedly infringing work is considered substantially similar to a copyrighted work if the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Id.* (internal quotation marks and citation omitted). Put another way, "[t]he touchstone of the analysis is the overall similarities rather than the minute differences between the two works." *Country Kids*, 77 F.3d at 1288 (internal quotation marks and citation omitted). Considering the works as a whole is particularly important because protectible expression may arise through the ways in which artists combine even unprotectible elements. For example, while color is not protectible, the manner in which an artist "select[s], coordinate[s], and arrange[s]" color may be. *Boisson*, 273 F.3d at 272; *see also Matthews*, 157 F.3d at 28 (observing that a "collage of newspaper headlines," not themselves protectible, if "juxtaposed in some highly creative and original fashion" could constitute protectible expression).

Finally, and of particular importance to this case, "[b]ecause substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation." *A.A. Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.1980); *see also Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir.1984) ("[S]ummary judgment . . . is a practice to be used sparingly in copyright infringement cases."). Of course, summary judgment for a copyright defendant remains appro-

priate if the works are so dissimilar as to protectible elements that no reasonable jury could find for the plaintiff on the question of substantial similarity. *See Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994) (setting forth general summary judgment rule); *Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir.1996) (affirming grant of summary judgment for copyright defendant because "any similarity in the theme of the parties' works relates to the unprotectible idea of a dinosaur zoo," and "[o]nce one goes beyond this level of abstraction, the similarity in themes disappears").

In assessing whether Sturdza's claim of substantial similarity presents a genuine issue of material fact, the district court first eliminated from consideration those elements of Demetriou's 1997 design that were present in his 1993 competition submission. These include the building's overall volume, backyard garden, and atrium. *See Sturdza*, No. 98–2051, slip op. at 11 (Oct. 30, 2000) (listing elements). The district court excluded these features because Sturdza's amended complaint alleges that Demetriou copied her design *after* preparing his original, 1993 competition entry. Because Sturdza does not challenge this aspect of the summary judgment decision, we too will exclude these elements of Demetriou's 1997 design from our consideration.

▆▆▆ The district court next "filter[ed] out" those elements of Sturdza's design it viewed as unprotectible ideas: "domes, wind-towers, parapets, arches, and Islamic patterns." *Id.* at 6, 12. According to the district court, Sturdza's expression of these elements, but not her use of them, is protectible. We agree with this aspect of the district court's decision. In and of themselves, domes, wind-towers, parapets, and arches represent ideas, not expression. *Cf. Wickham*, 739 F.2d at 1097 (holding that tower structure is idea not copyrightable expression); *Ale House*

*Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 143 (4th Cir.2000) (holding that island or peninsula-shaped bar bisecting seating area with booths on one side and stool seating on other "is nothing more than a concept"). Indeed, to hold otherwise would render basic architectural elements unavailable to architects generally, thus running afoul of the very purpose of the idea/expression distinction: promoting incentives for authors to produce original work while protecting society's interest in the free flow of ideas. *See Feist Publ'ns*, 499 U.S. at 349–50, 111 S.Ct. at 1288–89. We also agree that "Islamic" patterns are not protectible, though we would characterize them as *scènes à faire* dictated by the UAE's desire that the building "express[ ] the richness and variety of traditional Arab motifs." Particular shapes such as diamonds or circles that comprise a given pattern, however, do constitute ideas.

▆▆▆ Proceeding item by item, the district court then meticulously compared how the concepts of domes, wind-towers, parapets, arches, and decorative patterns (referred to by the district court as "Islamic" patterns) are expressed in the two designs. "[A]t the level of protectable expression," the district court concluded, "the designs are decidedly different." *Sturdza*, No. 98–2051, slip op. at 13 (Oct. 30, 2000).

Here we part company with the district court. Although we agree that Demetriou's design differs from Sturdza's, we think the district court overlooked several important respects in which Demetriou's design expresses particular architectural concepts quite similarly to Sturdza's. We also see significant similarities in the "overall look and feel" of the two designs. To help explain these two points, we attach as appendices to this opinion selected "elevations," i.e., views, of Sturdza's and Dem-

etriou's designs. Appendices A and B show front and side elevations of Sturdza's design. Appendices C and D show front and side elevations of Demetriou's 1997 design.

We begin with the ways in which Demetriou's expression of architectural concepts mirrors Sturdza's. Consider the domes. Although we agree that Demetriou's dome differs from Sturdza's in some respects— Demetriou's is opaque and positioned toward the front of the building, while Sturdza's rises directly over the building's central section and is made of "glass[,] . . . allowing light in through the pattern," Pl.'s Suppl. Answer to Def. Demetriou's Interrogs. at 4—in other respects Demetriou's dome appears quite similar. Viewed from the front, both domes appear to rise from the center and toward the front of the buildings. Both domes rise to essentially the same height, correspond in width to the buildings' midsections, and taper gently upward to a point. Although the domes have different decorative patterns, the patterns create a similar effect. Sturdza encircles her dome with three bands of pointed arches, largest at the dome's base and becoming progressively smaller toward its top. Her arches' decreasing size and pointed shape create a feeling of upward movement from the dome's base toward its top. Demetriou creates a similar effect by covering his dome with diamonds whose upper points correspond to Sturdza's pointed arches and that (like Sturdza's arches) become progressively smaller toward the top of the dome. Finally, Sturdza gives her dome a ribbed effect by raising the edges of the arches above the dome's surface; Demetriou creates a similar effect by accenting his diamonds' edges.

Like the domes, Demetriou's wind-towers differ in some respects from Sturdza's: Sturdza's are three-dimensional, emerge from the building's roof, and are decorated with diamond patterning; Demetriou's are essentially two-dimensional extensions of the building's front facade and are decorated with three vertical bands. Viewed from the front, however, the wind-towers appear quite similar in terms of size and placement. Indeed, because the wind-towers are essentially the same height and width and rise on either side of the domes, they create extremely similar building contours. Moreover, by placing diamonds atop the three vertical bands, Demetriou creates a decorative effect similar to Sturdza's.

We agree with the district court that the parapets, which run along the length of each building's upper perimeter, have different decorative patterns: carved-out diamonds (Sturdza's) as compared to vertical notches (Demetriou's). In other respects, however, the parapets seem quite similar. Like Sturdza's design, Demetriou's incorporates narrow vertical columns that rise from the ground to just above the parapet's upper edge, subdividing the parapet and marking it with regularly spaced protrusions (the columns' tips). In addition, both parapets rise to a greater height over the buildings' midsections (just beneath the domes, when viewed from the front). In combination, these characteristics give Demetriou's parapet a similar look and feel to Sturdza's and contribute to the marked similarity of the two buildings' contours.

Demetriou's arches, as the district court pointed out, differ in important ways from Sturdza's: Demetriou's are wide and low, appear on the ground level only, and have interiors decorated with latticework comprised of shapes somewhere between circles and diamonds; Sturdza's are high and narrow, appear on both the ground and third-floor levels, and have interiors decorated with latticework comprised of diamond shapes. Yet even with these differences, Demetriou uses arches to create an effect similar to the effect created by

Sturdza's arches. The portals of both buildings consist of large arches flanked on either side by smaller ones. This, together with the fact that the arches in both designs are pointed, creates a similar, pyramid-like cluster of arches at the centers of the buildings. Demetriou's latticework patterning adds to the similar feel. In both designs, the latticework consists of a web of small shapes surrounding larger, more open shapes at the center of each arch. Sturdza creates this effect by placing a few open diamonds at the center of her arches, surrounding them with diamonds bisected with vertical and horizontal lines. Demetriou creates a similar effect by placing a large, open, circular shape at the center of each arch, surrounded by smaller, circular shapes.

The final concept—decorative patterning that covers the facades of the two buildings—is the idea Demetriou expresses most differently. As the district court pointed out, Demetriou's patterning has sixteen-sided stars on the upper levels and shapes somewhere between a circle and a diamond on the ground level; Sturdza's has diamond shapes throughout. Demetriou also uses significantly less patterning overall than Sturdza, who covers the entire facade of her building with decoration. Even with these differences, however, we see a significant similarity: like Sturdza, Demetriou covers his building's facade with a grid of diamonds that creates a diamond motif and emphasizes the facade's division into horizontal and vertical planes.

Moving on to our second basis for questioning the district court's conclusion that the designs are "decidedly different," *id.* at 13, we see no indication that, in addition to comparing the ways in which the two architects express individual concepts, the district court considered the two buildings' "overall look and feel." *Boisson*, 273 F.3d at 272. Examining the two designs ourselves, we are struck by the significant extent to which Demetriou's design resembles Sturdza's. The size, shape, and placement of Demetriou's wind-towers, parapets, and pointed domes, when viewed from the front, give his building a contour virtually identical to Sturdza's. Contributing to the similarity in overall look and feel, both buildings have a pyramid-like clustering of pointed arches around the front entrances, prominent horizontal bands and vertical columns demarcating the windows, slightly protruding midsections, diamond grids, and similar latticework patterning inside the arches. Finally, Demetriou achieves the "Islamic" effect sought by the UAE by expressing and combining his wind-towers, arches, dome, parapet, and decorative patterning in ways quite similar to Sturdza's expression and combination of these elements.

To sum up, we think Demetriou's design, though different in some ways from Sturdza's (as the district court thought), is sufficiently similar with respect to both individual elements and overall look and feel for a reasonable jury to conclude that the two are substantially similar. Unless the jury "set out to detect the disparities" between the two works, it might well "be disposed to overlook them, and regard their aesthetic appeal as the same." *Boisson*, 273 F.3d at 272 (internal quotation marks and citation omitted). Because Sturdza's copyright claim presents an extremely close question, and because "summary judgment has traditionally been frowned upon in copyright litigation," *A.A. Hoehling*, 618 F.2d at 977, we will reverse the grant of summary judgment.

We conclude with some observations about two evidentiary issues which, though we have no need to resolve at this stage of the proceedings, may well arise on remand. One concerns the differences between Demetriou's 1997 design and his 1993 competition entry (Appendix E). His

original design has a distinctly boxy, modern office building look, round dome, little decoration, and no wind-towers, arches, or parapet. Much less boxy and modern, Demetriou's revised design, like Sturdza's, incorporates arches, wind-towers, a parapet, a *pointed* dome, and considerably more decorative patterning. According to Sturdza, these changes support her claim of substantial similarity. Demetriou and the UAE claim the changes relate only to the question of actual copying.

The other evidentiary issue concerns the use of expert evidence. In opposition to Demetriou's motion for summary judgment, Sturdza offered two expert declarations—one from a professor of Islamic art and architecture and another from a practicing architect. Demetriou moved to exclude these declarations as irrelevant to the question of substantial similarity. Declining to rule on the declarations' admissibility, the district court disregarded them as "conclusory and uninformative." *Sturdza*, No. 98–2051, slip op. at 6 n.4 (Oct. 30, 2000). On appeal, Sturdza insists that the declarations are relevant.

These evidentiary issues are complex and novel. Beginning with the first, although Demetriou and the UAE concede that the changes are clearly relevant to the question of actual copying, we are not at all sure why the changes in Demetriou's design support Sturdza's claim of substantial similarity: the question is whether Demetriou's end product (his revised design) is substantially similar to Sturdza's, not how it got that way. At oral argument, however, Sturdza's counsel theorized that the two versions could inform the jury about the "range of possibilities" available to Demetriou and thereby help the jury resolve the substantial similarity issue. Tr. of Oral Arg. at 54. Unfortunately, neither party identifies any authority on this intriguing question, nor have we found any ourselves.

By contrast, the use of expert testimony in copyright cases has received widespread judicial attention. Until recently, expert evidence was permitted only to help juries determine "whether ... the alleged infringer used the copyrighted work in making his own" (actual copying), not to determine "whether ... the copying was ... an unlawful appropriation" (substantial similarity). *Whelan Assocs. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1232 (3d Cir. 1986) (internal quotation marks and citation omitted); *see also Arnstein*, 154 F.2d at 468 (setting forth traditional rule proscribing expert evidence at "unlawful appropriation" step). A growing number of courts now permit expert testimony regarding substantial similarity in cases involving computer programs, reasoning that such testimony is needed due to the "complexity and unfamiliarity [of computer programs] to most members of the public." *Whelan*, 797 F.2d at 1232; *see also Computer Assocs., Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713–14 (2d Cir.1992) (permitting expert evidence on substantial similarity in computer program infringement case); FED. R. EVID. 702 (stating that expert evidence is admissible when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"). The Fourth Circuit has held that this more flexible approach to expert evidence could apply to a highly specialized musical arrangement. *See Dawson v. Hinshaw Music Inc.*, 905 F.2d 731, 736–38 (4th Cir. 1990) (remanding to the district court to determine if the audience for a spiritual composition was sufficiently specialized—and the lay audience therefore sufficiently unfamiliar with such works—to warrant expert evidence on the substantial similarity question). Neither we nor any other circuit, however, has considered whether expert evidence is admissible to show substantial similarity of architectural works,

nor has any circuit other than the Fourth approved the use of such evidence outside the computer program context. *Cf. Computer Assocs.*, 982 F.2d at 713–14 ("[W]e do not intend to disturb the traditional role of lay observers in judging substantial similarity in copyright cases that involve the aesthetic arts, such as music, visual works or literature.").

In addition to their novelty, these two issues share another common characteristic: though raised, they are virtually unbriefed. Because of this, and because of the importance of both issues to copyright law, we think it best to allow the parties to develop them under the capable direction of the district court. If necessary, we can revisit either or both issues in a subsequent appeal, with the benefit of full briefing.

### IV.

We turn next to Sturdza's breach of contract and quantum meruit claims. In Count One of the amended complaint, Sturdza alleges that the UAE breached its contract by "intentionally failing to memorialize the final contract ... concerning which substantial performance had already commenced; ... awarding the contract for the design and construction of the Embassy to ... Demetriou ... while simultaneously holding itself out to be engaged in a good faith agreement with ... [Sturdza]; and ... failing to pay [Sturdza] her fee or any portion thereof, including ... for work specifically requested of her by ... [the] UAE." First Am. Compl. ¶ 60. Count Two seeks quantum meruit recovery for Sturdza's preparation of the Embassy design as well as for services performed after being declared the competition winner. *See id.* ¶¶ 63–64. The district court granted summary judgment for the UAE, concluding that D.C. law bars Sturdza from obtaining contractual or quasi-contractual recovery because she had no license to practice architecture in the District either at the time she contracted with the UAE or when she performed the services for which she seeks compensation.

▮ The UAE argues that we may affirm on either of two alternative grounds. First, it claims that because it did not execute a written agreement, it never formed a contract with Sturdza. The D.C. Court of Appeals, however, has squarely held that although "[m]utual assent to a contract ... is most clearly evidenced by the terms of a signed written agreement, ... such a signed writing is not essential to the formation of a contract." *Davis v. Winfield*, 664 A.2d 836, 837 (D.C.1995).

▮ Second, echoing the district court, the UAE argues that D.C. licensing law bars Sturdza from obtaining the recovery she seeks. The D.C.Code provides that "no unlicensed person shall engage, directly or indirectly, in the practice of architecture in the District." D.C. CODE § 47–2853.63 (2001) (formerly codified at D.C. CODE § 2–261 (1981)). The "practice of architecture" means "rendering or offering to render services in connection with the design and construction, enlargement, or alteration of a structure.... [including] planning and providing studies, designs, drawings, specifications, and other technical submissions, and the administration of construction contracts." D.C. CODE § 47–2853.61 (2001) (formerly codified at D.C. CODE § 2–241 (1981)). The D.C. Court of Appeals has held that "a contract made in violation of a licensing statute that is designed to protect the public will usually be considered void and unenforceable." *Truitt v. Miller*, 407 A.2d 1073, 1079 (D.C. 1979). A person violating such a statute may recover in neither contract nor quasi-contract. *See, e.g., Cevern v. Ferbish*, 666 A.2d 17, 19–20 (D.C.1995) (holding that home improvement contractor could not recover in contract or quasi-contract where

the contractor accepted advance payment while unlicensed, in violation of the home improvement licensing statute); *Saul v. Rowan Heating and Air Conditioning, Inc.*, 623 A.2d 619, 621–22 (D.C.1993) (holding that air conditioning contractor could not recover for services provided where the contractor was unlicensed at the time he entered into contract and performed work, in violation of the refrigeration/air conditioning services licensing statute).

Sturdza argues that her failure to have a D.C. architecture license does not bar her contract and quasi-contract claims. According to Sturdza, her work falls within a statutory exception permitting unlicensed architects to "prepare technical submissions or . . . administ[er] . . . construction contracts under the direct supervision of an architect licensed in the District." D.C. CODE § 2–262(3) (1981) (repealed by Second Omnibus Regulatory Reform Amendment Act of 1998 § 1235, 46 D.C.Reg. 3142, 3212). We disagree. Although Sturdza apparently did collaborate to some extent with a D.C. architect, *see* Sturdza Aff. (Aug. 20, 1999) ¶ 2 ("At all times pertinent hereto, I was associated and worked with . . . an architect licensed in the District of Columbia. . . ."), she never alleges that she was under his direct supervision nor, according to the amended complaint, was her work limited to "technical submissions" or "administ[ering] . . . construction contracts." Sturdza next argues that she only seeks to enforce a contract for future services and that she would have obtained a D.C. license by the time she actually rendered those services. This argument is equally without merit, for it directly contradicts her allegation that while unlicensed she "substantial[ly] perform[ed]" the contract upon which she seeks to recover. First Am. Compl. ¶ 60. Finally, Sturdza argues that application of the D.C. licensing requirement would violate the Foreign Missions Act, 22 U.S.C. § 4301.

Not only does she fail to tell us which provision of the statute she thinks is implicated, but she relies on a case dealing with an entirely different situation: the D.C. zoning board's effort to prevent a foreign chancery from constructing a radio tower for diplomatic communications. *See Embassy of Benin v. District of Columbia Bd. of Zoning Adjustment*, 534 A.2d 310 (D.C. 1987).

■■■ Returning to the licensing principles enunciated by the D.C. Court of Appeals, we are inclined to agree with the district court that D.C. law precludes Sturdza from obtaining contractual or quasi-contractual recovery. Sturdza had no D.C. license and, as her amended complaint concedes, she went beyond submitting bids and actually performed architectural services—in her own words, "substantial[ly] perform[ed]" the contract. First Am. Compl. ¶ 60; *cf., e.g., Saul*, 623 A.2d at 620 (holding contractor barred from recovery because he contracted and performed work without license). That said, we are mindful that a "'federal court . . . should normally decline to speculate on . . . a question of local doctrine.'" *East v. Graphic Arts Indus. Joint Pension Trust*, 107 F.3d 911, 911 (D.C.Cir.1997) (quoting *Delahanty v. Hinckley*, 845 F.2d 1069, 1070 (D.C.Cir.1988)). Although decades ago, the D.C. Court of Appeals held that an architect who failed to comply with a then-existing license *renewal* provision could not recover for services performed during the period in which his license had lapsed, *see Holiday Homes, Inc. v. Briley*, 122 A.2d 229, 231–32 (D.C.1956), that court has never expressly determined whether the provision at issue here bars unlicensed architects from enforcing their contracts or recovering in quantum meruit. Nor has the D.C. Court of Appeals considered the implica-

tions (if any) of a statutory exception that permits architects licensed elsewhere to "agree to perform or represent that he or she is able to perform any of the services involved in the practice of architecture, provided that the architect shall not perform any of the services involved in the practice of architecture until licensed under this act." D.C. CODE § 2–262(6) (1981) (repealed by Second Omnibus Regulatory Reform Amendment Act of 1998 § 1235, 46 D.C.Reg. 3142, 3212). Although this exception was repealed since the events at issue here, the basic licensing framework for architects remains unchanged. *See* D.C. CODE § 47–2853.63 (2001) (prohibiting unlicensed persons from engaging in practice of architecture in the District).

 We thus think the wisest course of action is to certify this issue to the D.C. Court of Appeals. *See* D.C. CODE § 11–723(a) (2001) ("[A] Court of Appeals of the United States" may certify "questions of law" to the D.C. Court of Appeals when "it appears to the certifying court [that] there is no controlling precedent in the decisions of the D.C. Court of Appeals."). District of Columbia law is " 'genuinely uncertain,' " *Dial A Car, Inc. v. Transp., Inc.,* 132 F.3d 743, 746 (D.C.Cir.1998) (quoting *Tidler v. Eli Lilly & Co.,* 851 F.2d 418, 426 (D.C.Cir.1988)), and this case presents a question of " 'extreme public importance,' " *id.* at 746 (quoting *Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 563–64 (D.C.Cir.1993)). We assume that architects throughout the country (perhaps even around the world) unlicensed to practice in the District often submit bids to perform architectural services in this city of embassies, monuments, and public buildings. Precisely how D.C. law applies to this unique characteristic of Washington, D.C. and its economy is a question best resolved by the D.C. Courts. Accordingly, we will certify the following question to the D.C. Court of Appeals:

Under District of Columbia law, is an architect barred from recovering on a contract to perform architectural services in the District or in quantum meruit for architectural services rendered in the District because the architect began negotiating for the contract, entered into the contract, and/or performed such services while licensed to practice architecture in another jurisdiction, but not in the District?

## V.

 The district court dismissed Counts Five, Six, and Seven, which allege that Demetriou conspired to commit fraud, tortiously interfered with Sturdza's contract, and intentionally inflicted emotional distress, on the ground that all three claims are preempted under Section 301 of the Copyright Act. That section provides:

[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as defined by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103 ... are governed exclusively by this title.... [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). In "broadly pre-empting state statutory and common-law copyright regulation," *Cmty. For Creative Non–Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2168, 104 L.Ed.2d 811 (1989), Congress sought to "enhanc[e] predictability and certainty of copyright ownership," *id.* at 749, 109 S.Ct. at 2177, by establishing a "uniform method for protecting and enforcing certain rights in intellectual property," *Daboub v. Gibbons,* 42 F.3d 285, 288 (5th Cir.1995). That said,

"[n]othing in ... [the Copyright Act] annuls or limits any rights or remedies under the common laws or statutes of any State with respect to ... [a work] that does not come within the subject matter of copyright ... [or] activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright." 17 U.S.C. § 301(b)(1), (3). In other words, preemption has both "subject matter" and "equivalency" requirements: the copyrighted work must be the type of work protected by copyright law and the state law right must be equivalent to a right protected by the Copyright Act. *See Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir.2001).

Architectural designs unquestionably fall within the "subject matter" of copyright. Indeed, the Copyright Act expressly mentions "architectural works." *See* 17 U.S.C. § 102(a)(8). Preemption in this case thus turns on whether Counts Five, Six, and Seven assert state law rights "equivalent" to rights protected by the Copyright Act, namely, the "exclusive rights" of a copyright owner "to reproduce the copyrighted work[,] ... to prepare derivative works[,] ... to distribute copies ... of the copyrighted work to the public by sale or other [means,] ... to perform the copyrighted work publicly[,] ... [and] to display the copyrighted work publicly." 17 U.S.C. § 106. State law protects rights "equivalent" to an "exclusive right[ ] within the general scope of copyright" where the "state law may be abridged by an act which, in and of itself, would infringe one of those exclusive rights." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir.1983), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Put another way, "if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim." *Wrench*, 256 F.3d at 456. To determine whether a state law claim is qualitatively different from a copyright claim—that is, whether the state claim has an "extra element"—courts generally examine both the elements of the state law cause of action and the way the plaintiff has actually pled that cause of action. *See id.* at 456–58 (explaining that breach of contract claim is ordinarily not preempted because it requires extra element of breach of promise to pay for author's work, but preemption applies where plaintiff alleges only breach of promise to refrain from reproducing, performing, distributing, or displaying work); *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1441–42 (9th Cir.1993) (observing that whether state law misappropriation claim was preempted depended on facts alleged—e.g., claim for misappropriation of time and labor expended in developing idea would be preempted, but claim for misappropriation of fruits of plaintiff's labor by marketing plaintiff's product under defendant's name would not). With these standards in mind, we consider the three claims the district court found preempted by copyright law.

Count Six, the intentional interference with contract claim, alleges that Demetriou "had knowledge of the contract" between Sturdza and the UAE and "intentionally interfered" with that contract. First Am. Compl. ¶¶ 85–86. Count Six incorporates by reference Count One, which in turn alleges that "[d]uring ... [the UAE's] negotiations with [Sturdza] in connection with the performance of its agreement with ... [her], ... [the] UAE entered into an architectural services agreement with ... Demetriou ... with-

out justification and without notice to plaintiff[,]" and that the UAE breached its agreement with Sturdza by among other things failing to execute a final contract and awarding the contract to Demetriou. *See id.* ¶¶ 59–60. Under D.C. law, tortious interference with contract has four elements: "(1) existence of a contract, (2) knowledge of the contract, (3) intentional procurement of its breach by the defendant, and (4) damages resulting from the breach." *Sorrells v. Garfinckel's, Brooks Bros., Miller & Rhoads, Inc.*, 565 A.2d 285, 289 (D.C.1989) (internal quotation marks and citation omitted).

 The district court would have been entirely correct had Sturdza claimed only that Demetriou, by copying her design, "intentional[ly] procur[ed] [the] breach," that is, caused the UAE to cancel its contract with her. Such a claim would not differ qualitatively from a copyright claim because both would rest on Demetriou's unauthorized copying—"an act which in and of itself would infringe on one of th[e] exclusive rights" protected by the Copyright Act. *Harper & Row,* 723 F.2d at 200. Although tortious interference with contract claims are typically found preempted for this very reason, *see* 1 NIMMER & NIMMER, *supra* p. 1295, § 1.01[B][1][a], at 1–17 to 1–19 and n.73.1, a different result is warranted where the defendant interferes with the plaintiff's contractual rights through conduct *other* than "reproduction[,] . . . preparation[,] . . . distribution[,] . . . performance[,] . . . or display" of the copyrighted work, 17 U.S.C. § 106. This is just such a case. As pled, the core of Sturdza's tortious interference with contract claim is her allegation that Demetriou, knowing the UAE had agreed to award the embassy contract to Sturdza, entered into his own contract with the UAE to build the embassy. True, Sturdza also alleges that the design Demetriou contracted to use infringes hers. But Count Six does not rise or fall on this allegation. Even if Demetriou's design were entirely his own, Sturdza could proceed on her tortious interference with contract claim based on her other allegations. Because Sturdza's claim differs qualitatively from her copyright infringement claim, it is not preempted.

 Sturdza's intentional infliction of emotional distress claim, Count Seven, alleges that Demetriou's "acts as alleged herein were undertaken intentionally, beyond the bounds of all decency and with reckless disregard of the consequences, i.e., injury to plaintiff, especially since defendants knew how many years plaintiff had devoted to the Embassy project and how important this project was to her." First Am. Compl. ¶ 90. Count Seven incorporates Sturdza's other allegations, including Count Six (tortious interference with contract) and Count One (breach of contract); the latter alleges that "[a]s a result of defendant UAE's breach of contract, plaintiff has suffered damages, including severe emotional distress." *Id.* ¶ 61. In the District of Columbia, intentional infliction of emotional distress has three elements: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Howard Univ. v. Best,* 484 A.2d 958, 985 (D.C.1984) (internal quotation marks and citation omitted).

 Had Sturdza alleged that Demetriou's "extreme and outrageous conduct" consisted solely of stealing her design, her claim would be preempted, for the core of such a claim would not differ qualitatively from a copyright infringement claim. But by incorporating Counts One and Six into Count Seven and expressly referencing infliction of emotional distress, the amended complaint premises Sturdza's emotional distress claim on the UAE's breach of contract and Demetriou's procurement of

that breach through conduct other than the "reproduction[,] ... preparation[,] ... distribution[,] ... performance[,] ... or display," 17 U.S.C. § 106, of her design. Because Sturdza's intentional infliction of emotional distress claim is thus qualitatively different from her copyright claim, it is not preempted.

■■■ Count Five, the conspiracy to commit fraud claim, alleges that Demetriou "engaged in a concerted pattern of activity in furtherance of the scheme which was intended to and ultimately did defraud plaintiff"—a scheme whereby the UAE "intentionally and knowingly ... misrepresent[ed] [to Sturdza] ... that it had entered into a contract with her for the construction of the Embassy." First Am. Compl. ¶¶ 81–83. In the District of Columbia, "a cause of action for civil conspiracy must allege the formation and operation of the conspiracy, wrongful acts done in furtherance of the common scheme, and damages suffered as a result." *Higgs v. Higgs*, 472 A.2d 875, 877 (D.C.1984). "It is not necessary to aver facts against an alleged conspirator that satisfy all of the elements of fraud." *Id.*

■■■ Like Counts Six and Seven, Count Five rests on more than Demetriou's alleged unauthorized copying of Sturdza's design. Because Count Five defines the fraudulent scheme in terms of the UAE's misrepresentations regarding the status of its contract with Sturdza, and because it incorporates the complaint's other allegations, the count can be fairly read to allege that Demetriou "further[ed] ... the [UAE's fraudulent] scheme" by entering into his own negotiations and contract with the UAE to design the embassy while knowing all along that the UAE had contracted with Sturdza to perform the very same work. Thus, Count Five is qualitatively different from Sturdza's copyright claim and not preempted.

In reaching this latter conclusion, we express no opinion as to whether the conspiracy to commit fraud claim could survive a motion for judgment on the pleadings. *See* FED. R. CIV. P. 12(c); *see also* FED. R. CIV. P. 9(b) ("In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity."); *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir.1985) ("[I]n actions alleging conspiracy to defraud or conceal, the particularity requirements of Rule 9(b) must be met."). Demetriou neither made such a motion in the district court nor presents the argument here.

We conclude with an observation about all three tort claims. As Sturdza herself points out, the claims "depend[ ] only on Demetriou's participation in UAE's breach of contract and violation of the rights and expectations that Ms. Sturdza had as a result of UAE's conduct towards her." Appellant's Br. at 30; *see also Deoudes v. G.B. Macke Corp.*, 153 A.2d 309, 310 (D.C. 1959) (holding that the "core" of a tortious interference with contract claim "is that one who intentionally induces another to break a *valid* contract is liable" (emphasis added)). Accordingly, should the D.C. Court of Appeals answer the certified question affirmatively, thus barring Sturdza's contract claim against the UAE, the district court will need to consider the implications of that decision for Sturdza's ability to pursue her tort claims against Demetriou.

## VI.

■■■ This brings us finally to the district court's Rule 12(b)(6) dismissal of Count Eight, which alleges that the UAE, in violation of 42 U.S.C. § 1985, "conspired to violate ... [Sturdza's] property and contract rights because ... [the] UAE did not wish to have a female chief architect for the construction of the Embassy."

First Am. Compl. ¶ 105. Section 1985 makes it unlawful for "two or more persons in any State . . . [to] conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). The district court, noting that the liability of a foreign sovereign under section 1985 is a novel issue—only one court has even discussed it, *see Rios v. Marshall,* 530 F.Supp. 351, 372 n. 22 (S.D.N.Y.1981) (stating in dicta that foreign sovereigns are not "persons" for purposes of federal civil rights statutes)—concluded that such an entity is not a "person" within the meaning of the statute.

Section 1985 contains no definition of "person." *See* 42 U.S.C. § 1985. The Dictionary Act defines "person" for purposes of "determining the meaning of any Act of Congress, unless the context indicates otherwise," as including "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. The Act does not expressly mention foreign sovereigns. *See id.* The Supreme Court, moreover, has "repeatedly held that the word 'person' in a statute does not include a sovereign government absent affirmative evidence of such an inclusory intent." *Al Fayed v. CIA,* 229 F.3d 272, 274 (D.C.Cir.2000) (citing Supreme Court cases). In addition to the statutory text, such evidence includes "the purpose, the subject matter, the context, the legislative history, [or] the executive interpretation of the statute." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund,* 500 U.S. 72, 83, 111 S.Ct. 1700, 1707, 114 L.Ed.2d 134 (1991) (internal quotation marks and citation omitted) (alteration in original); *see also, e.g., Pfizer, Inc. v. Gov't of India,* 434 U.S. 308, 313–20, 98 S.Ct. 584, 587–91, 54 L.Ed.2d 563 (1978) (finding foreign government to be "person" entitled to sue under Sherman Anti–Trust Act based on evidence of Congressional intent that term have "broad . . . meaning" and that Act have "expansive remedial purpose"). Sturdza points to neither legislative history nor any other evidence suggesting that Congress intended section 1985 to cover foreign governments. Indeed, the Supreme Court has held that a foreign government is not a "'person' as that term is used in § 1983," *Breard v. Greene,* 523 U.S. 371, 378, 118 S.Ct. 1352, 1356, 140 L.Ed.2d 529 (1998), and sections 1983 and 1985 are interpreted consistently with each other, *see Owens v. Haas,* 601 F.2d 1242, 1247 (2d Cir.1979). Sturdza points out that the term "person" as used in section 1985 and related provisions of the Civil Rights Act has been interpreted to include municipalities, *see, e.g., LeBlanc–Sternberg v. Village of Airmont,* 67 F.3d 412, 426–27 (2d Cir.1995), but that is because "the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies," *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). For all of these reasons, we agree with the district court that a foreign government is not a "person" within the meaning of section 1985.

### VII.

The motion to dismiss this appeal is denied. The grant of summary judgment for Demetriou and the UAE on Sturdza's copyright claim is reversed. The Rule 12(b)(6) dismissal of Counts Five, Six, and Seven (the tort claims) as to Demetriou is also reversed. The Rule 12(b)(6) dismissal of Sturdza's section 1985 claim is affirmed. The question whether D.C. law bars Sturdza's contract and quantum meruit claims is certified to the District of Columbia Court of Appeals, and all further proceedings in

this matter shall be held in abeyance pending further order of this court.

*So ordered.*

### KAREN LeCRAFT HENDERSON, Circuit Judge, concurring:

I concur in the majority's holding that the question of substantial similarity under the Copyright Act must be submitted to the jury—but do so only reluctantly. I believe, as did the district court, that, when properly compared, Demetriou's final design and Sturdza's contest design are not substantially similar. By properly compared I mean without regard to Demetriou's 1993 contest submission (the appearance of which cannot possibly be relevant to whether the two designs compared here are substantially similar to each other) and with due regard for the prevalence in both designs of the unprotectible commonplaces of Islamic architecture identified by the district court, namely, "domes, wind-towers, parapets, arches, and Islamic patterns." *Sturdza v. United Arab Emirates,* No. 98–2051, slip op. at 12. Viewed in this light, the two designs are more notable for their differences than for their similarities; the expression in each of the common unprotectible ideas is, as the district court described it, "decidedly different." *Id.* at 13–15. Nevertheless, given the degree of subjectivity inherent in assessing substantial similarity, I cannot say, as a matter of law, that no reasonable juror could find the two designs are substantially similar. Accordingly, I join in the majority's disposition of the Copyright Act claim as I do in its resolution of the other issues raised.

FRONT ELEVATION

## Appendix A
### Elena Sturdza

SIDE ELEVATION

# APPENDIX B
## ELENA STURDZA

FRONT ELEVATION

# APPENDIX C
## ANGELOS DEMETRIOU (1997)

SIDE ELEVATION

# Appendix D
### Angelos Demetriou (1997)

## APPENDIX E
### ANGELOS DEMETRIOU (1993)